**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MANIQUE MASON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 13 C 2993** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **CAROLYN W. COLVIN,[1] Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Manique Mason, seeks review of the final decision of the Commissioner

("Commissioner") of the Social Security Administration ("Agency") denying her application for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C.

§ 1382c(a)(3)(A). Ms. Mason asks the court to reverse and remand the Commissioner's decision,

while the Commissioner seeks an order affirming the decision.

**I.**

**PROCEDURAL HISTORY**

Ms. Mason applied for SSI on December 10, 2007, alleging that she had become disabled

on April 15, 2001(Administrative Record ("R.") 133-35), but later changed that allegation to October

6, 2006 (R. 143), and claimed she was unable to work due to bipolar depression, which made her

unable to be around people, concentrate, or relax. (R. 147). Her claim was denied initially and upon

reconsideration. (R. 76-85). Ms. Mason continued pursuit of her claim by filing a timely request for

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for
Michael J. Astrue as the appellee.

hearing. (R. 87-89).

An administrative law judge ("ALJ") convened a hearing on May 17, 2010, at which Ms. Mason, represented by counsel, appeared and testified. (R. 25-52). In addition, Edward Pagella testified as a vocational expert. (R. 46). On October 22, 2010, the ALJ issued a decision finding that Ms. Mason was not disabled because she retained the capacity to perform light work that involved simple routine tasks, no more than occasional interaction with the general public, and that allowed her to be off task 15% of the time and miss 1¾ days a month. (R. 60-68). This became the final decision of the Commissioner when the Appeals Council denied Ms. Mason's request for review of the decision on February 22, 2012. (R. 14-18). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Mason has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

### THE EVIDENCE OF RECORD

#### A.

#### The Vocational Evidence

Ms. Mason was born on December 9, 1977, making her thirty-two years old at the time of the ALJ's decision. (R. 133). She has a high school education, and a brief and sporadic work history of about four years her entire life. She moved from job to job from 1997 to 2000 (R. 148, 151), and briefly worked again in 2005. (R. 178).

#### B.

#### The Medical Evidence

There is precious little medical evidence in the record that would suggest Ms. Mason is

unable to perform any work. Even she can cite just seven scant pages of medical evidence she feels support her claim in her brief. (*Plaintiff's Brief*, at 1-2). The bulk of the record pertains to her recovery from a broken, non-dominant, left arm she suffered in July 2008. (R. 31, 227-268). Her course of treatment was uneventful and she healed as expected. (R. 264-68). If the episode is of any relevance to Ms. Mason's claim it is because of the varying accounts of her injury she gave her treating physicians. On one occasion, she said she was merely a pedestrian hit by a car. (R. 233). On another, she related that she had been in a car chase and was struck by the vehicle pursuing her from behind, noticing her broken arm when she got out of her car. (R. 232).

The evidence pertaining to her depression reveals that she sought treatment at Stroger County Hospital now and again over the course of a few years from late 2002 to 2007. Over those five or six years, she sought treatment just nine times, and none of the mental health professionals who saw her gave any indication that she was restricted from working to any degree. Generally, all of these visits were occasioned by Ms. Mason needing refills of her medications. In November 2003, Ms. Mason reported going off her medications because she thought she felt better and she wanted to lose weight. But, this resulted in racing thoughts, trouble sleeping, and an inability to concentrate. Her affect was normal, her speech was normal, her thoughts were logical, and her insight was intact. She was placed back on her medications – Depakote, Zoloft, and Ambien. (R. 219).

On January 30, 2004, Ms. Mason returned to County Hospital to have her medications changed. She was experiencing racing thoughts and anxiety. She had no suicidal thoughts or depressed mood. She did think people were talking about her. Her insight and judgment were noted to be fair and she was mildly agitated, anxious, and irritable. Her Depakote and Ambien were increased, her Zoloft was continued, and Klonipin was added to her regimen. (R. 218).

3

Ms. Mason sought no further treatment until July 19, 2004, when she reported being depressed over the death of her boyfriend, who had been shot a week earlier. Prior to that, she had been doing well. Her affect was noted to be depressed but appropriate. Her medications were continued. (R. 217).[2]

Ms. Mason returned to Stroger County Hospital two months later, and said her medication was working, although she had been off it for a month. Her mood was okay, her affect was normal, and thought process was linear. Insight and judgment were intact. (R. 216). At her next visit, she reported she was okay although she had been off her medications for two weeks. Her mood was noted to be euthymic and her insight fair. (R. 215).

In January of 2006, Ms. Mason found out she was pregnant and had to go off her medications. She was ambivalent about the pregnancy. Her mood and thoughts were normal, and her insight was fair. (R. 214). On May 3, 2006, Ms. Mason went to Stroger County Hospital seeking medication. She had been off her regimen because she had been pregnant but, as she had an abortion, she wanted to go back on them again. She felt relaxed with them. Her mood was euthymic, her speech was normal, and her thoughts were goal-oriented and logical.

Ms. Mason reported she was feeling okay and looking for work on August 10, 2006. She complained about gaining weight, but was doing well on her medications. Her attitude was positive and her insight was fair. (R. 212). On September 24, 2006, she went in to Stroger County Hospital for a medication refill, complaining of being depressed. She said she couldn't work because her concentration was poor. She was alert and oriented and had good eye contact. She denied any

---

[2] The treatment note states that Ms. Mason's Depakote and Klonipin were being increased, but the level of Depakote was actually decreased from January 2006, and the level of Klonipin was the same. (R. 217-18).

thoughts about suicide.  (R. 209).

On March 19, 2007, Ms. Mason said she was depressed and not sleeping well.  She claimed she couldn't hold a job because she was easily distracted.  She admitted to drinking and admitted as well that it contributed to her depressed mood.  She was instructed to decrease her alcohol use.  She was also told to exercise.  There was no suicidal ideation or paranoia.  (R. 211).  On May 9, 2007, Ms. Mason reported she was feeling better, sleeping well, and her mood was stable.  (R. 210).

On April 2, 2008, Ms. Mason had a consultative psychological examination arranged by the state disability agency.  She told Dr. Robert Neufeld that she had an associates's degree from Robert Morris College and worked as a phlebotomist for six months.  (R. 204).  She was fired for bossing people around.  Ms. Mason explained that she used to be a "party animal" but since her boyfriend died in 2006, she did little partying.  She was always tired and layed down most of the day.  (R. 204).  Upon examination, her attitude was cooperative, her thoughts were logical, and her speech was well-conceptualized and articulated.  She was oriented and her memory was fine.  Her abstract thinking was normal, but her fund of general knowledge was deficient.  She said she didn't know who Martin Luther King was or the number of weeks in a year.  Her judgment was fair.  She knew to mail a letter she found, and that eating raw meat would make her sick.  If she were lost in a forest, she would retrace her steps.  (R. 205).

Dr. Neufeld diagnosed Ms. Mason with adjustment disorder with depressed mood and avoidance personality disorder.  (R. 205).  He assigned her a Global Assessment of Functioning score of 65 (R. 205), denoting "[s]ome *mild* symptoms (*e.g.*, depressed mood and mild insomnia) or *some* difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but *generally functioning pretty well*, has some meaningful interpersonal

relationships." http://www.gafscore.com/ (emphasis supplied).

Dr. Elizabeth Kuester, M.D., reviewed the evidence at this point and found Ms. Mason had some moderate limitations in her ability to carry out and remember detailed instructions, maintain concentration for extended periods, deal with the general public, and set realistic goals. (R. 200-201). She was not significantly limited in other areas, including carrying out and remembering simple instructions, dealing with coworkers, or responding appropriately to supervisors. (R. 200-201).

Ms. Mason sought no further treatment until April of 2010. She had moved to Virginia for two years. She stopped refilling her prescriptions, instead taking her mother's medications. She said her own medication had never helped her but her mother's did. Still she said she was nervous, irritable, and had racing thoughts. She denied using drugs or alcohol. She was hoping to get SSI, but explained that in the meantime, she was working as a "prostitute for money." (R. 271). Upon examination, it was noted that her insight and judgment were good, her attention and concentration were good, and she exhibited no suicidal ideation. (R. 272).

### C.

### The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

At her hearing, Ms. Mason proved to be an incredible, albeit interesting, witness. When the ALJ asked whether she had a Link card, she first said she was "trying." When the ALJ asked her again, she admitted she did have a Link card. (R. 29). When she applied for benefits, she claimed she did not have one. (R. 134). She also said she had never applied for benefits before. (R. 143).

This, too, was false, as she had applied at least one other time – and been denied – in 2001. (R. 140). While Ms. Mason told the ALJ she had no income at all (R. 29), she told one of her treating doctors she was making money as a prostitute. (R. 271). She also claimed – to both the ALJ and Dr. Neufeld – that she had worked as a phlebotomist. (R. 29, 204). But, when the ALJ called her on that one, she said that she "[n]ever" had. (R. 30).

Ms. Mason claimed that she had no strength to do things like cooking. (R. 32). She was always tired. (R. 32). She said she could not tolerate large crowds because she cannot sit for long periods. (R. 32) She was unable to relax, but spent her days in bed. (R. 32). Ms. Mason explained that she had lost a number of jobs because she didn't get along with others, wouldn't follow directions, and missed work too often. (R. 36). She said she couldn't do anything like a factory job because of her left arm; she couldn't lift over five pounds. (R. 39). Ms. Mason gave her weight as 180 pounds. (R. 43). She used to weigh 145, but had gained weight form "[e]ating and laying and sleeping." (R. 44).

Ms. Mason claimed she had seen a psychiatrist, Dr. Mandelbaum, a month before her hearing. But when the ALJ remarked that there were no records of any treatment from that time, Ms. Mason said that she hadn't seen Dr. Mandelbaum, but "a lady that fills in for him." (R. 34). That still would not explain the absence of any records, of course. Ms. Mason told the ALJ that a month before that, she went to a different hospital, used her mother's medical card, and claimed to be her mother to get medication. (R. 35-36). She said she didn't get any medical treatment for a number of years because she could not afford it. (R. 37). Yet, she had been receiving free treatment at Stroger County Hospital all along. (R. 37). When the ALJ pointed that out, Ms. Mason changed her story and said the real problem was that she didn't have bus fare. (R. 37). But, she had already told

the ALJ that she didn't take public transit because she was uncomfortable around people.  (R. 37).

All in all, it was a struggle for the ALJ to get any truthful testimony out of Ms. Mason.

## 2.

### The Vocational Expert's Testimony

Mr. Pagella then testified as a vocational expert ("VE").  The ALJ posed a series of hypotheticals to the VE, asking whether such person could perform Ms. Mason's past work or any work in th regional economy.   The hypothetical person in the questions was a person of plaintiff's age, with her education and work experience, who could carry 10 pounds frequently and 20 pounds occasionally; could just 5 pounds with her left arm; could sit, stand, or walk up to six hours; perform simple, routine, repetitive tasks; tolerate occasional contact with the public, coworkers, and changes in the work routine could not perform Ms. Mason's past work due to the contact with the public and coworkers those jobs entailed.  Such a person could, however, perform manufacturing work such as hand packing, hand sorting, and assembling.  (R. 47).  If the person did not have any trouble with her left arm, she could, of course, perform these same jobs.  (R. 47-48).  There were 4700 hand packer positions in the region, 5600 hand assembler positions, and 1800 hand sorter positions.  (R. 48).  If the same person were limited to lifting or carry just 10 pounds, she could perform  sedentary-level versions of bench packager (4300 jobs), hand assembler (3200), and hand sorter (1200).  (R. 49).

The ALJ asked how much time off task was permitted in these jobs.  The VE said that no more that 15% would be tolerated.  He added that a person could be off work for 22 days a year, or 1¾ days a month.  (R. 49).  When questioned by Ms. Mason's counsel regarding the intellectual requirements for such work, the VE explained that difficulties with math or alphabetizing would not

disqualify a person from such work.  (R. 50-51).

## D.

## The ALJ's Decision

The ALJ found that Ms. Mason suffered from the following severe impairments: left arm fractures; mood disorder; bipolar disorder; and avoidant personality disorder. (R. 62).  She further found that Ms. Mason did not have an impairment or combination of impairments that met or equaled a listed impairment.  (R. 63).  The ALJ noted that there was no evidence that Ms. Mason's arm fracture caused any problems with her ability to perform fine or gross movements.  (R. 63). Ms. Mason's mental impairments caused only mild restrictions on her daily living, moderate difficulties in social functioning and concentration, and no episodes of decompensation.  (R. 64).

Next, the ALJ summarized the evidence in the medical record and discussed Ms. Mason's testimony, and determined that she retained the capacity to perform light work that involved simple routine tasks, no more than occasional interaction with the general public, and that allowed her to be off task 15% of the time and miss 1¾ days a month.  (R. 64).

The ALJ found Ms. Mason to be a generally unpersuasive witness.  She felt that the medical evidence did not support the extent of her allegations.  (R. 31).  She noted that she was deceitful, using her mother's medical card fraudulently.  Despite allegations of disabling psychological symptoms, she did not seek treatment for long stretches of time – 2½ years at one point.  Her explanations for not seeking the free care she knew through past experience was available to her, were not credible.  Medical notes show that she responded well to her medications when she took them, and the consultative psychologist found that her symptoms were mild.  (R. 66).

The ALJ went on to consider the VE's testimony. Crediting it, she found that, given her residual functional capacity ("RFC"), Ms. Mason could perform jobs that exist in significant numbers in the economy. These jobs included hand packer, hand sorter, and hand assembler. (R. 67). Accordingly, the ALJ found Ms. Mason not disabled and not entitled to SSI under the Act. (R. 32).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is

required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not provide a written evaluation of every piece of evidence and testimony, *Pepper v. Colvin* 712 F.3d 351, 362 (7th Cir.2013); Dixon, 270 F.3d at 1176,shecannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). That is, the ALJ must "provide some glimpse into her reasoning." *Dixon,* 270 F.3d at 1176. The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Id.*; *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). An ALJ need "only 'minimally articulate his or her justification for rejecting or accepting specific evidence of a disability.' ... [T]his is a 'lax standard.'" *Berger*, 516 F.3d at 544.

As occurs so often where catch phrases are involved, the phrase, "logical bridge" has taken on a life of its own as though it were some self-defining and exacting test, which requires that an ALJ's decision be viewed grudgingly. But, as Justice Holmes warned, courts must be wary of the uncritical and indiscriminate use of labels and catch phrases: "It is not the first use but the tiresome repetition of inadequate catch words upon which I am observing—phrases which originally were contributions, but which, by their very felicity, delay further analysis...." Holmes, *Law and Science and Science and Law,* 12 Harv. L. Rev. 443, 455 (1899). *See also Lorenzo v. Wirth,* 170 Mass. 596, 600, 49 N.E. 1010 (1898) (Holmes, J.)("Too broadly generalized conceptions are a constant source of fallacy").

Indeed, Judge Posner, who first used the phrase in a Social Security context in his opinion

in *Sarchet,* would be the first to acknowledge that it was not meant as a self-defining test or formula. *Compare, e.g., United States v. Edwards,* 581 F.3d 604, 608 (7th Cir.2009)( "We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 990 (7th Cir.2004). The point Judge Posner sought to make in *Sarchet* was that unexplained conclusions by Administrative Law Judges, no less than by federal judges, are not persuasive and preclude meaningful appellate review.

But there is nothing particularly novel about that conclusion, as *Sarchet,* itself, recognized with its reliance on *Herron v. Shalala,* 19 F.3d 329 (7th Cir.1994). There, the court said: "Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence. Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion. We have repeatedly stated that the ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some minimal level his analysis of the evidence.' " *Id.* at 333–334 (citations omitted).

Thus, *Sarchet* never intended that the "logical bridge" requirement compel or warrant a hypercritical approach to an ALJ's decision. The "logical bridge" requirement is not about *elegantia juris or* aesthetics. The ALJ need not build the Pont Neuf. A simple trestle will suffice so long as it allows the reviewing court to traverse safely the divide between the evidence and the conclusions. The ALJ's explanations in this case do that.

## B.

## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

## Analysis

Ms. Mason's first disagreement with the ALJ's decision is that the ALJ improperly assessed her mental RFC because she found her limited in her ability to have contact with the general public but not with her coworkers. Further, she claims the ALJ did not explain why Ms. Mason would be off task for no more than 15% of the time or miss no more than 1¾ days a month. Next, Ms. Mason complains that the ALJ did not explain how she could possibly perform light work when she had broken her arm in 2008. According to Ms. Mason, the ALJ had to obtain a doctor's assessment of her physical RFC. Also, the ALJ failed to take into account her claimed need to lie down during the day. Ms. Mason goes on to submit that the ALJ improperly assessed her credibility. She says the ALJ did not address specifically some of her statements or explain how specific statements were contradicted by the evidence. Ms. Mason also thinks the ALJ should not have taken into consideration her lack of treatment. Finally, Ms. Mason takes the ALJ to task for using "boilerplate language" in her credibility finding.

## 1.

It is not surprising that, given the dearth of medical evidence in the record suggesting she might be disabled, Ms. Mason focuses her attentions on a bundle of hypercritical "logical bridge" arguments. In the Seventh Circuit, an ALJ's decision can be supported by substantial evidence – or even a preponderance of the evidence, as it is here – but still will be overturned if the ALJ fails to build a "logical bridge" from the evidence to her conclusion. *Sarchet*, 78 F.3d at 307. The court has explained that this requirement is no different than what it demands of a district court opinion. *Id.* (". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence

14

and the result.").[3]

And so, Social Security briefs in this Circuit routinely invoke the "logical bridge" requirement without meaningful analysis as though it were a talisman, without regard to the overall accuracy and comprehensiveness of the ALJ's decision. But *Sarchet* never intended its requirement that the ALJ explain the reasons for his conclusion as a self-defining test to be blithely invoked by disappointed litigants. It was never intended to impose some more arduous requirement on an ALJ than on a district judge. All that is necessary is that there be some minimal explanation that allow the reviewing court to track the thought process of the decision maker. Hence, the Court's recognition that what is required is not overly exacting. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997)(ALJ "must articulate at some minimum level his analysis of the evidence in cases in which considerable evidence is presented to counter the agency's position."); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)("We require only "a minimal level of articulation by the ALJ as to his assessment of the evidence ... in cases in which considerable evidence is presented by the claimant"). It is, after all, a "very deferential" standard that the Seventh Circuit describes as "lax." *Elder*, 529 F.3d at 415; *Berger*, 516 F.3d at 545.

Ms. Mason is concerned that the ALJ did not adequately explain why she could have more than occasional contact with the general public, but had no such restriction on contact with her coworkers. The ALJ drew her RFC finding in this regard from the medical opinion of Dr. Elizabeth

_____

[3] But the comparison is not a perfect one. *See In re Sulfuric Acid Antitrust Litigation*, 703 F.3d 1004, 1008 (7th Cir. 2012)(Posner, J.)(affirming district court ruling although it "was abrupt and not explained"); *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010)("We may affirm the district court's grant of summary judgment for any reason supported by the record."); *Vargas-Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 974 (7th Cir. 2001)("We are not bound by the rationale underlying the district court's determination. Rather, we may affirm the district court's judgment "on any ground that is supported in the record.").

Kuester, who, after reviewing the medical evidence, found Ms. Mason moderately limited in her ability to interact with the general public, but not significantly limited in her ability to interact with coworkers. (R. 66, 200-201). The medical opinion of a state agency reviewing physician or psychiatrist can constitute substantial evidence to support an ALJ's opinion, especially where there is no other medical opinion to contradict it. Indeed, the rules themselves recognize this principle, 20 CFR 416.927(e), as do the cases. *See Murphy v. Astrue*, 454 Fed.Appx. 514, 519 (7th Cir. 2012); *Fleming v. Astrue*, 448 Fed.Appx. 631, 634 (7th Cir. 2011); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

The only evidence Ms. Mason cites that runs counter to this conclusion is her own testimony. But, "of course, the Administrative law judge did not have to believe" Ms. Mason, *Sarchet ,* 78 F.3d at 307, or accept her testimony at face value. Under the Social Security Act, administrative law judges are not inert and wooden participants in an empty ritual, the preordained end of which is to award benefits to those in claimed distress, regardless of whether they qualify under the Act or give incredible testimony.

The purpose of a social security hearing is to enable the ALJ to determine where the truth lies and to administer the Act in conformity with Congress's carefully crafted statutory framework. Administrative law judges are functionally comparable to Article III judges, *Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985); *Tennessee Student Assistance Corp. v. Hood,* 541 U.S. 440, 457 (2004), and thus, there is nothing inappropriate about an ALJ's questioning of a witness to gauge the truthfulness of testimony. Indeed, in the non-adversarial setting of a social security hearing there is no one else to perform that indispensable task, and questioning witnesses is consistent with and demanded by the ALJ's basic obligation to develop a full and fair record and

to scrupulously and conscientiously explore all relevant facts that bear on the claimant's capacity to work or his or her entitlement to benefits. *Cf. Heckler v. Campbell* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Johnson v. Barnhart,* 449 F.3d 804 (7th Cir.2006); *Madrid v. Barnhart,* 447 F.3d 788 (10th Cir.2006).

Here, Ms. Mason was clearly not a convincing or credible witness. If that is not already obvious from the preceding discussion it will become so as we continue to explore the ALJ's explanation. Obviously if the ALJ did not believe Ms. Mason, she could not properly have included her alleged limitations a part of the RFC determination. *Seamon v. Astrue*, 364 Fed.Appx. 243, 248 (7th Cir. 2010); *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir.2007).

Ms. Mason has a similar complaint about the ALJ's finding that she would be off task no more than 15% of the time and miss no more than 1¾ days of work per month. It's unclear why Ms. Mason should have a problem with this finding as there is no medical evidence in the record to suggest that she would be off task or miss work to *any* degree due to her impairments. Her claim rests, then, exclusively on her own testimony, which the ALJ did not credit because she found her not to be a believable witness, as she explained in more than sufficient detail. *See also* the discussion, *infra* at 19 regarding review of credibility determinations.

It is apparent that the ALJ gave Ms. Mason the benefit of the doubt given the fact that the VE testified that these limitations would be tolerated in the jobs Ms. Mason was capable of performing. (R. 49, 66). That's no reason to remand a case in which there is little or no medical evidence hinting that the claimant is disabled. That wouldn't just be nit-picking, but picking nits off the nits. *Burnam v. Colvin*, 525 Fed.Appx. 461, 464 (7th Cir. 2013); *Castile v. Astrue,* 617 F.3d 923, 929 (7th

Cir.2010).

To the extent that the two district court cases Ms. Mason cites hold that an ALJ may not give a claimant the benefit of the doubt in this manner, they are not binding, and I choose not to follow them. *See Camreta v. Greene*, – U.S. –, –, 131 S.Ct. 2020, 2033 (2011)("'A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.'" (quotation omitted)). Moreover, one of the cases, *Zenka v. Astrue*, 904 F.Supp.2d 884 (N.D.Ill. 2012), does not even support the point Ms. Mason is attempting to make. The court there clearly refused to remand the case simply because the ALJ gave the claimant the benefit of the doubt on being off task. 904 F.Spp.2d at 901. As for the other case, *Washington v. Colvin*, 2013 WL 1903247, 10-11 (N.D.Ill. 2013), it is clear that the court was impressed with the claimant's credibility, precisely the opposite of the situation here. Again, more on that later. *See infra* at 19.

### 2.

Ms. Mason next argues that the ALJ's analysis of her physical capacity for work was flawed because there was no doctor's opinion on the subject. She relies on *Suide v. Astrue*, 371 Fed.Appx. 684 (7th Cir. 2010), but that case does not support her arguments. In *Suide*, the court did not say that an ALJ could not arrive at an RFC if she did not have a physician's opinion to rely upon, because that's not the law. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)("As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians."). Instead, the court simply required that the ALJ's RFC be based on substantial evidence. *Suide*, 371

Fed.Appx. at 690. It was here.

While the ALJ in *Suide* failed to offer an adequate discussion of the medical evidence that remained in play once she discounted the treating physician's opinion, the ALJ here engaged in a lengthy discussion of the medical evidence. Along the way, she reviewed the evidence pertaining to Ms. Mason's broken, non-dominant arm. (R. 62, 63, 66). The fact of the matter is, her doctors said her arm healed as expected.[4]

**3.**

Ms. Mason's final complaints about the ALJ's denial of her application concern the ALJ's negative assessment of her credibility. This is a startling argument given the record in the case. The administrative law judge's credibility determination is given "special deference," *Schomas v. Colvin,* 732 F.3d 702, 708 (7th Cir.2013); *Castile v. Astrue,* 617 F.3d 923, 929 (7th Cir.2010), because the ALJ, not a reviewing court, is in the best position to evaluate credibility, having had the opportunity to observe the claimant testifying. *Jones v. Astrue,* 623 F.3d 1155,1160 (7th Cir.2010). *Compare Ashcraft v. Tennessee,* 322 U.S. 143, 171, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (Jackson, J., dissenting)("A few minutes observation of the parties in the courtroom is more informing than reams of cold record.").[5] The credibility determination need not be flawless, *Simila,* 573 F.3d at 517, and

---

[4] Curiously, Ms. Mason likens her situation to that of the claimant in *Richards v. Astrue*, 370 Fed.Appx. 727 (7th Cir. 2010). But *Richards* dealt with the requirement that a state agency physician complete a PRTF regarding a claimant's mental impairment. *Id.* at 370-71. That was clearly done in this case. (R. 186-203). There is no similar requirement in cases of an alleged physical impairment. *See* 20 CFR 1520a(a)(evaluation of mental impairments requires additional steps that evaluation of physical impairments do not).

[5] The rule is the same as that applied to district courts. *United States v. Thousand,* 558 Fed.Appx. 666, 671 (7th Cir.2014).

will be reversed only if is "patently wrong." *Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir.2014); *Bates v. Colvin*, 736 F.3d 1093, 109-8 (7th Cir. 2013). That occurs only when the determination "lacks any explanation or support." *Murphy*, *supra*. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue,* 390 Fed.Appx. 581, 587 (7th Cir.2010). *See also Milliken v. Astrue,* 397 Fed.Appx. 218, 225, 2010 WL 4024908, 7 (7th Cir.2010)(appellant has a "heavy burden of showing that the ALJ's credibility determination is patently wrong."). Here, not only was the ALJ's judgment and perception "patently" right, had she come out the other way it would have been "patently" wrong.

This case shows that Social Security hearings are not exempt from the basic axiom of experience that parties will exaggerate when it is to their advantage. *Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir.2009); *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir.2006); *Brown v. Chater,* 87 F.3d 963, 965–66 (8th Cir.1996). *See supra* at 16. Ms. Mason, the ALJ essentially found, began her odyssey of deception in this case when she applied for disability benefits. She claimed that she had never filed for benefits before (R. 143) when, in fact, she had. (R. 140). She falsified her work history to the consultative examiner. She claimed to have worked as a phlebotomist for six months when she had not, even carefully adding the detail that she had been fired because people said she bossed them around (R. 204) – a detail carefully inserted because it supported her claim that she couldn't work around people. Of course, since the first apart was untrue, so was the addition.

She tried the same story with the ALJ, but when the ALJ questioned her about it, Ms. Mason was forced to admit she held no such job. (R. 29). And, as already noted, she added other prevarications and equivocations in her hearing testimony, not the least of which was her testimony

under oath to the ALJ that she had no income, when she told had admitted to her own treating psychiatrist she was a "prostitute for money." (R. 271).[6]

That this type of thing has continued in Ms. Mason's brief is, of course, equally if not more troubling. Ms. Mason argues that the ALJ should not have used the fact that she didn't seek treatment for three years following her alleged onset of disability against her. But neither the regulations nor the cases stand for any such rigid, proscriptive principle. Quite the opposite. *Nicholson v. Astrue,* 341 Fed.Appx. 248, 252, 2009 WL 2512417, 3 (7th Cir. 2009). "It is true that "infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Beardsley v. Colvin,* 758 F.3d 834, 840 (7th Cir.2014); SSR 96–7p (a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

But the ALJ may not draw any inferences about a claimant's credibility from the infrequency or absence of treatment if the failure is a function of the condition such as Schizophrenia, *Overstreet v. Wilson,* 686 F.3d 404, 416 (7th Cir.2012), or where there is a credible explanation. *Beardsley, supra.*; *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir.2013). And, the ALJ must inquire whether there is an explanation for the applicant's behavior. That is exactly what the ALJ did in this case when she explored the explanations for not seeking treatment and found them not credible.

As Ms. Mason did at the hearing, her brief alternates between explanations for not seeking treatment when she was purportedly disabled. First, she says she couldn't afford it; the hospital sent her a bill. (*Plaintiff's Brief*, at 14; R. 37). Inability to pay for medical service excuses a claimant's

---

[6] There was no claim to her doctor that her efforts were financially unremunerative, and the ALJ was not obligated to speculate in Ms. Mason's favor in this or any other aspect of the case.

failure to seek treatment and robs the omission of relevance. *Roddy,* 705 F.3d at 638. But the explanation must be credible. Here, Ms. Mason has never had to pay for any of her prior medical treatments at Stroger. (*see supra* at 3,4, 7). While she has not had the course of treatment one might expect of someone alleging her level of symptoms, she has been to doctors a number of times over the years either for her arm or her psychological problems, and has never had to paid for it.

Confronted with these facts, Ms. Mason changed her story to not having bus fare and later saying she didn't think she needed treatment. Vacillating explanations reflect poorly on a witness's veracity. *See, e.g., McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010); *Singh v. Gonzales*, 487 F.3d 1056, 1060 (7th Cir. 2007). *Ryder Truck Rental v. NLRB,* 401 F.3d 815, 827 (7th Cir.2005); *NLRB v. Dorothy Shamrock Coal Co.,* 833 F.2d 1263, 1268 (7th Cir.1987).

To make matters worse, Ms. Mason's brief compounds all this by asserting that free medical treatment is not available at Stroger Hospital. (*Plaintiff's Brief*, at 15). Quite apart from the fact that unsupported statements by lawyers in briefs are not evidence and don't count, *United States v. Adriatico-Fernandez,* 498 Fed.Appx. 596, 599-600 (7th Cir. 2012), the statement is untrue. The website for the hospital clearly states that "[n]o patient will be denied Cook County Health and Hospitals Services based on ability to pay. http://www.cookcountyhhs. org/patient-services/billing-financial-assistance/. If Ms. Mason truly had no ability to pay, free treatment was available at Stroger hospital – as the ALJ found given her history of care received at Stroger over the years.

These sorts of untrue statement and unavailing arguments seen all too often in briefs are pointless and undercut other arguments. *Walker v. Abbott Laboratories,* 416 F.3d 641, 643 (7th Cir.

2005)(decrying the tendency of some lawyers to pile on arguments); *Rehman v. Gonzales*, 441 F.3d 506, 508-09 (7th Cir. 2006); *United States v. Brocksmith*, 991 F.2d 1363, 1366 (7th Cir. 1993)("A client is disserved when the most meritorious arguments are drowned in a sea of words."). *United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001); *Rice v. Nova Biomedical Corp.,* 38 F.3d 908, 918 (7th Cir. 1994).

As discussed earlier, to have an ALJ's credibility determination overturned, a plaintiff must demonstrate not just that it is wrong, but that it is "*patently* wrong." *Bates,*, 736 F.3d at 1098. Here, the ALJ made the only credibility assessment that could withstand scrutiny given the record. And she provided ample and valid reasoning. The ALJ noted that Ms. Mason's allegations were out of proportion with the medical evidence.[7] and inconsistent with her treatment record. The Seventh Circuit has chastised ALJs for relying on a lack of treatment to find a claimant not credible without exploring the reasons for that lack of treatment. *See Pierce v. Colvin,* 739 F.3d 1046, 1050 (7th Cir. 2014) and cases cited *supra* at 21. But here, the ALJ *did* explore the reasons and found them wanting. An ALJ need not accept at face value any reason a claimant gives for not pursuing treatment – especially where as here the testimony was vacillating.[8]

ALJs, like judges, are not required to leave their common sense and experience at the hearing room or courthouse door. *Castile v. Astrue,* 617 F.3d 923, 930 (7th Cir.2010). *See generally, District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 135 n.3 (1992); *United States v.*

---

[7] There was, for instance, nothing in the medical record that suggested that Ms. Mason would have to lie down for much of the day as she alleged, and Ms. Mason certainly is unable to identify any such evidence in her brief. (*Plaintiff's Brief*, at 11-12).

[8] And even where an ALJ does not explore the reasons for an absence of treatment, it does not automatically undercut the ALJ's other valid reasons for discounting a claimant's testimony. *Hoyt v. Colvin,* 553 Fed.Appx. 625, 628 (7th Cir.2014).

*Blagojevich,* 614 F.3d 287, 290 (7th Cir.2010); *United States v. Babul*, 476 F.3d 498, 503 (7th Cir. 2007). Free medical treatment is available at Stroger County Hospital, not to mention other clinics in the city. Ms. Mason was well aware of the availability of services at Stroger, having utilized them repeatedly. To overturn the ALJ's ruling on this basis would be to say that all claimant's without insurance could claim debilitating symptoms unsupported by a treatment record and ALJ's would be constrained to believe them and award benefits. This is plainly not the meaning of cases like *Beardsley and Pierce.*

Further, her lack of treatment did not support her alleged level of symptoms, her testimony was at best equivocal, and her conduct in using her mother's medical card tended to show she was a deceitful person. (R. 66). Any one of these reasons provides adequate support for an adverse credibility finding. *See, e.g.,Pepper*, 712 F.3d at 368-69 (7th Cir. 2013)(claimant not credible where allegations out of proportion with medical records); *Lott v. Colvin*, – F.3d –, –, 2013 WL 5630633, 4 (7th Cir. 2013)(claimant not credible where there was a paucity of medical evidence confirming a limited ability to work); *Schrieber v. Colvin*, 519 Fed.Appx. 951, 961 (7th Cir. 2013)(discrepancy between complaints of pain and "lack of evidence regarding those symptoms in the treatment notes" was a valid reason for finding claimant not credible); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010)(where "objective medical evidence . . . revealed only mild degenerative change . . . the ALJ properly relied upon the discrepancy" to find the claimant not credible)[9]; *Shauger v. Astrue*, 675

---

[9] It should be noted that the Seventh Circuit has also said on more than one occasion that "an ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results." *Pierce,* 739 F.3d at 1050 (citing cases). It is difficult to resolve this seeming inconsistency in the Seventh Circuit's thoughts on claimant credibility and objective medical evidence. If the Seventh Circuit means to say that, in a case where the claimant's complaints are out of proportion with the medical evidence an ALJ must find additional reasons to find the claimant not credible,

(continued...)

F.3d 690, 696 (7th Cir. 2012)(history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility); *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013)(even a minor inconsistency in testimony is enough to sustain an adverse credibility finding). Ms. Mason cannot seriously expect a reviewing court to overturn this ALJ's credibility determination as patently wrong under these circumstances.

Two more points need be addressed. First, Ms. Mason argues that the ALJ's decision must be overturned because she failed to specifically address each of her statements and note which ones she found credible, which ones she did not, and why. But the law does not require the ALJ to go through a claimant's testimony on a statement-by-statement basis. *Pepper*, 712 F.3d at 369; *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). Thankfully so, for that would truly be "sacrific[ing] on the altar of perfectionism the claims of other people stuck in the queue." *Stephens*, 766 F.2d at 288.

Second, this is yet another case in which Ms. Mason's counsel has relied on the fact that the ALJ used the repeatedly condemned "boilerplate" language about credibility and the RFC – the claimant's symptoms "are not credible to the extent they are inconsistent with" her RFC. *See, e.g., Lott v. Colvin,* 541 Fed.Appx. 702, 705 (7th Cir. 2013). But while he Court continues to criticize the ALJs' usage of this backward reasoning phrase, the ALJs perversely, it seems, continue to utilize it. And so, given this perversity and intransigence, it is perhaps hard to fault lawyers whose briefs are equally intransigent in relying on the ALJs' resort to the boilerplate.

---

<sup>9</sup>(...continued)
the ALJ has done so here. Although that would be an odd requirement. Imagine a case – it's not difficult, as there are many – where the medical record demonstrates that the claimant has only mild, minimal, or no limitations. It is difficult to see why the ALJ would be "patently wrong" in finding such a claimant's allegations that he or she was completely disabled as result not credible.

Nonetheless, the fact remains that the Seventh Circuit has made clear that the use of the boilerplate alone is not reversible error and thus lawyers who continue to cite the language without more, do not advance their clients' interests one whit. As the Seventh Circuit has explained, the question is not whether the boilerplate language has been used by the ALJ, but whether the ALJ goes on to supply reasons for her credibility determination. *See, e.g.,Schomas v. Colvin,* 732 F.3d 702, 708 (7th Cir. 2013); *Pepper,* 712 F.3d 351, 367–68; *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir.2012). The only issue is whether the ultimate reasoning is valid[10]

## CONCLUSION

The plaintiff's motion for summary judgment [Dkt. #19] is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

**ENTERED:** _____

                              **UNITED STATES MAGISTRATE JUDGE**

**DATE:** 10/29/14

---

[10] Ms. Mason's lawyer, in case after case, ignores these cases and relies solely on the ALJs' use of boilerplate language, arguing, incorrectly, that, under Seventh Circuit precedent, the ALJ's use of the formula alone requires remand. *See, e.g.,Triplett v. Colvin*, 2013 WL 6169562, 8 (N.D.Ill. 2013); *Khan v. Colvin*, 2013 WL 5700961, 7 (N.D.Ill. 2013); *Orienti v. Astrue,* 2013 WL 4008719, *12–13 (N.D.Ill.2013); *Patton v. Colvin,* 2013 WL 4024506, *3 n.3 (N.D.Ill.2013); *Goins v. Colvin*, 2013 WL 5609336, 16 (N.D.Ill. 2013); *Harris v. Astrue*, 2013 WL 3895229, 13 (N.D.Ill. 2013); *West v. Colvin*, 2013 WL 3728807, 16 (N.D.Ill. 2013); *Perry v. Colvin*, 945 F.Supp.2d 949, 967 (N.D.Ill. 2013).